**BRODSKY SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANE WINSOR,

Plaintiff,

vs.

SHOCKWAVE MEDICAL, INC., RAY LARKIN, DOUG GODSHALL, KEVIN BALLINGER, LAURA FRANCIS, FREDERIC MOLL, ANTOINE PAPIERNIK, MARIA SAINZ, SARA TOYLOY, and JAY WATKINS,

Defendants.

Case No.:

**Complaint For:** 5:24-cv-2727

(1) Violation of § 14(a) of the Securities Exchange Act of 1934
(2) Violation of § 20(a) of the Securities Exchange Act of 1934

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff, Jane Winsor ("Plaintiff"), by and through her attorneys, alleges upon information and belief, except for those allegations that pertain to her, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1. Plaintiff brings this stockholder action against Shockwave Medical, Inc. ("Shockwave" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," collectively with the Company, the "Defendants"), for violations of

Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to Johnson & Johnson ("Parent") through merger vehicle Sweep Merger Sub, Inc. ("Merger Sub," together with Parent, "J&J"), as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in an April 5, 2024, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, J&J will acquire all outstanding shares of Shockwave common stock for $335.00 per share in cash, corresponding to an enterprise value of approximately $13.1 billion including cash acquired.

3. Thereafter, on April 18, 2024, the Company filed a Preliminary Proxy Statement on Form PREM14A with the SEC in support of the Proposed Transaction, followed by a Definitive Proxy Statement on April 29, 2024 (together, the "Proxy Statement").

4. The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For example: (a) Company insiders own large illiquid blocks of Company stock which will be converted into merger consideration; (b) Company insiders own company options, restricted stock units, and other equity awards, all of which are subject to accelerated vesting and conversion into merger consideration; and (c) certain Company executives are entitled to severance packages, often referred to as "golden parachute" packages, entitling same to millions of dollars not shared by Plaintiff and other Company common stockholders.

5. The Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to vote in favor of the Proposed Transaction and is thus in violation of the Exchange Act. As detailed below, the Proxy Statement omits and/or misrepresents material information concerning, among other things: (a)

the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Shockwave, provided by Shockwave management to the Company Board and the Board's financial advisor Perella Weinberg Partners LP ("Perella Weinberg") and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinion created by Perella Weinberg, if any, and provide to the Company and the Special Committee.

6. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.

## PARTIES

7. Plaintiff is a citizen of Massachusetts, and at all times relevant hereto, has been a Shockwave stockholder.

8. Defendant Shockwave, a medical device company, develops and commercializes intravascular lithotripsy (IVL) technology for the treatment of calcified plaque in patients with peripheral and coronary vascular, and heart valve diseases in the United States and internationally. The Company is incorporated in Delaware and has its principal place of business at 5403 Betsy Ross Drive, Santa Clara, CA 95054. Shares of Shockwave common stock are traded on the NASDAQ Stock Market under the symbol "SWAV."

9. Defendant Ray Larkin ("Larkin") has been a Director of the Company at all relevant times. In addition, Defendant Larkin serves as the Chairman of the Board.

10. Defendant Doug Godshall ("Godshall") has been a director of the Company at all relevant times. In addition, Defendant Godshall serves as the Company's President and Chief Executive Officer ("CEO").

11. Defendant Kevin Ballinger ("Ballinger") has been a director of the Company at all relevant times.

12. Defendant Laura Francis ("Francis") has been a director of the Company at all relevant times.

13. Defendant Frederic Moll ("Moll") has been a director of the Company at all relevant times.

14. Defendant Antoine Papiernik ("Papiernik") has been a director of the Company at all relevant times.

15. Defendant Maria Sainz ("Sainz") has been a director of the Company at all relevant times.

16. Defendant Sara Toyloy ("Toyloy") has been a director of the Company at all relevant times.

17. Defendant Jay Watkins ("Watkins") has been a director of the Company at all relevant times.

18. Defendants identified in ¶¶ 9 - 17 are collectively referred to as the "Individual Defendants."

19. Non-Party J&J, together with its subsidiaries, researches, develops, manufactures, and sells various products in the healthcare field worldwide.

**JURISDICTION AND VENUE**

20. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

21. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its headquarters in this District.

## SUBSTANTIVE ALLEGATIONS

***Company Background***

23. Shockwave, a medical device company, develops and commercializes intravascular lithotripsy (IVL) technology for the treatment of calcified plaque in patients with peripheral and coronary vascular, and heart valve diseases in the United States and internationally.

24. In a press release on February 15, 2024, for the Fourth Quarter and Full Year 2023 Financial Results, the Company highlighted its performance results and financial success. For example, the Company recognized revenue of $203.0 million for the fourth quarter of 2023 and $730.2 million for the full year 2023, representing increases of 41% and 49%, respectively, from the same periods in 2022; Gross profit for the fourth quarter of 2023 was $177.7 million compared to $126.5 million for the corresponding prior year period; and Adjusted EBITDA was $68.2 million in the fourth quarter of 2023, a 20% increase compared to adjusted EBITDA of $56.6 million in the fourth quarter of 2022.

25. Speaking on the results, CEO Doug Godshall stated, "The team ended 2023 with solid performances across our business and geographies."

26. Godshall expounded upon the above by stating, "Our record revenue is a testament to the continued clinical need for our innovative products and our ability to grow the Shockwave organization to meet those needs as we pursue our mission to improve outcomes for patients suffering from cardiovascular disease."

27. These financial results are not an anomaly, but rather, are indicative of a trend of continued success by Shockwave. Based upon these positive results and outlook, the Company is likely to have future success.

28. Despite this upward trajectory, the Individual Defendants have caused Shockwave to enter into the Proposed Transaction without providing requisite information to Shockwave stockholders such as Plaintiff.

***The Flawed Sales Process***

29. As detailed in the Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company.

30. The Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and J&J, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Proxy Statement, if so, in all specific manners.

31. The Proxy Statement fails to adequately disclose the full scope of communications regarding post-transaction employment of Isaac Zacharias ("Zacharias"), President and Chief Commercial Officer ("CCO") of the Company, and Patrick Stephens ("Stephens"), the Company's Vice President of Research & Development, including specifically, the terms of the proposed retention agreement for Mr. Stephens.

32. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

***The Proposed Transaction***

33. On April 5, 2024, Shockwave and J&J issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> NEW BRUNSWICK, N.J. & SANTA CLARA, Calif.--(BUSINESS WIRE)--Apr. 5, 2024-- Johnson & Johnson (NYSE: JNJ) and Shockwave Medical, Inc. (Nasdaq: SWAV) ("Shockwave") today announced that they have entered into a definitive agreement under which Johnson & Johnson will acquire all outstanding shares of Shockwave for $335.00 per share in cash, corresponding to an enterprise value of approximately $13.1 billion including cash acquired. The transaction was approved by both companies' boards of directors.
>
> The acquisition of Shockwave further extends Johnson & Johnson MedTech's position in cardiovascular intervention and accelerates its shift into higher-growth

markets. Cardiovascular intervention is one of the fastest-growing global medtech markets, with significant unmet patient need. With the addition of Shockwave, Johnson & Johnson will expand its MedTech cardiovascular portfolio into two of the highest-growth, innovation-oriented segments of cardiovascular intervention – coronary artery disease (CAD) and peripheral artery disease (PAD). The transaction follows Johnson & Johnson MedTech's successful acquisitions of Abiomed, a leader in heart recovery, and more recently Laminar, an innovator in left atrial appendage elimination for patients with non-valvular atrial fibrillation (AFib). These acquisitions complement and build on Johnson & Johnson's established global leadership position in electrophysiology through the Biosense Webster portfolio. Following the close of the transaction, Johnson & Johnson MedTech will be a category leader in four high-growth cardiovascular segments.

Shockwave is a leading, first-to-market provider of innovative intravascular lithotripsy (IVL) technology for the treatment of calcified CAD and PAD. IVL is a minimally invasive, catheter-based treatment for calcified arterial lesions, which can reduce blood flow and cause pain or heart attack. IVL helps restore blood flow by cracking calcium lesions using sonic pressure waves and is used in both CAD and PAD, often in combination with stenting. Shockwave offers the only commercially available IVL technology and has safely, simply, and effectively treated approximately 400,000 patients globally. In addition to its leading IVL platform, Shockwave also recently acquired Neovasc Inc., a company that has developed the Reducer System, a novel product focused on symptom relief of refractory angina. The Reducer System has a growing commercial presence. It is currently undergoing clinical studies in the U.S. and is CE marked in the European Union and the United Kingdom.

Joaquin Duato, Chairman and Chief Executive Officer of Johnson & Johnson, said, "With our focus on Innovative Medicine and MedTech, Johnson & Johnson has a long history of tackling cardiovascular disease – the leading cause of death globally. The acquisition of Shockwave and its leading IVL technology provides a unique opportunity to accelerate our impact in cardiovascular intervention and drive greater value for patients, shareholders and health systems."

Tim Schmid, Executive Vice President and Worldwide Chairman of Johnson & Johnson MedTech, said, "Shockwave offers a truly differentiated opportunity to further enhance our leadership position in medtech, expand into additional high-growth segments, and ultimately transform the future of cardiovascular treatment. Shockwave's IVL technology for treating CAD and PAD, and its strong pipeline, are in a class of their own. We look forward to bringing Shockwave's solutions into Johnson & Johnson MedTech and the hands of more physicians around the world."

"Shockwave has transformed the treatment of complex calcified arterial disease through the pioneering development of intravascular lithotripsy, and it is our mission to make this remarkable technology available to patients worldwide," said Doug Godshall, President and CEO of Shockwave. "As part of a larger, more

diverse organization, with broad expertise and a core focus on improving patient outcomes, we are confident we will be able to further solidify IVL as the global standard of care for patients. I am deeply grateful to our team members and colleagues whose efforts have made today's milestone possible; their accomplishments and passion have been extraordinary. I could not think of a better partner and home than Johnson & Johnson as the Shockwave team prepares to write its next exciting chapter."

**Transaction Benefits**

- **Solidifies Johnson & Johnson MedTech's leadership in cardiovascular intervention**: IVL is the only technology that can treat both intimal and medial calcification, and Shockwave offers the first and only commercially available IVL platform for CAD and PAD. This acquisition will complement Johnson & Johnson MedTech's leadership positions in heart recovery (Abiomed) and electrophysiology (Biosense Webster) to make it a category leader in four of the largest and highest-growth medtech markets within cardiovascular intervention.

- **Enhances opportunity to serve patients worldwide through complementary fit with Johnson & Johnson**: Shockwave's IVL and Abiomed's Impella® heart pump platform play a critical role in complex percutaneous coronary intervention (PCI) procedures. Specifically, IVL is used in approximately 30% of high-risk PCI cases that also use Impella® today. This clinical compatibility, combined with Johnson & Johnson MedTech's established global commercial infrastructure, provides numerous opportunities to accelerate the adoption of these segment-leading technologies to patients in need.

- **Provides robust pipeline for future growth in underpenetrated markets**: Shockwave benefits from a strong pipeline focused on continued innovation and expansion of its product portfolio in CAD and PAD, and the potential use of IVL in new indications, including carotid artery disease and structural heart disease, over the coming years. Shockwave is also evaluating its Reducer System technology in clinical studies to treat patients with refractory angina.

- **Accelerates sales growth**: The acquisition of Shockwave accelerates Johnson & Johnson MedTech's ongoing efforts to increase its presence in high-growth markets with unmet need, while expanding its reach and scale globally. The proposed transaction adds a high-performing business in an underpenetrated category with a strong pipeline and an attractive growth and margin profile. The transaction is expected to accelerate revenue growth for both Johnson & Johnson and Johnson & Johnson MedTech. Shockwave is ultimately expected to become Johnson & Johnson MedTech's thirteenth priority platform, as defined by annual sales of at least $1 billion.

- **Delivers immediate operational accretion**: The transaction will be accretive to operating margin for both Johnson & Johnson and Johnson & Johnson MedTech. Johnson & Johnson expects the transaction to be operationally accretive upon closing, but considering the impact of financing costs, is expected to dilute adjusted earnings per share by approximately $0.10 in 2024 and approximately $0.17 in 2025.

**Transaction Details and Path to Completion**

Under the terms of the agreement, Johnson & Johnson will acquire all outstanding shares of Shockwave for $335.00 per share in cash through a merger of Shockwave with a wholly owned Johnson & Johnson subsidiary. Johnson & Johnson expects to fund the transaction through a combination of cash on hand and debt.

Johnson & Johnson expects to maintain a strong balance sheet and to continue to support its stated capital allocation priorities of R&D investment, competitive dividends, value-creating acquisitions and strategic share repurchases.

Following the completion of the transaction, Shockwave will operate as a business unit within Johnson & Johnson MedTech, and financials will be reported within Johnson & Johnson MedTech's Cardiovascular portfolio, which was previously referred to as Interventional Solutions. In addition to his current responsibilities for Abiomed as the Global Head of Heart Recovery, Michael Bodner will assume responsibility for the business upon close. Isaac Zacharias, who has 6 years with Shockwave, most recently serving as President and Chief Commercial Officer, will transition to become Worldwide President of Shockwave, reporting to Michael Bodner. Doug Godshall, Shockwave's President and Chief Executive Officer, will advise through the transition.

The closing of the transaction is expected to occur by mid-year 2024 subject to the receipt of Shockwave's shareholder approval, as well as the receipt of applicable regulatory approvals and other customary closing conditions. Following completion of the transaction, Shockwave's common stock will no longer be listed for trading on the Nasdaq Global Select Market.

***Potential Conflicts of Interest***

34. The breakdown of the benefits of the deal indicates that Shockwave insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Shockwave.

35. Company insiders, currently own large, illiquid portions of Company stock all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company as follows:

| Name | Shares Beneficially Owned (#) | Cash Consideration for Shares Beneficially Owned ($) |
|---|---|---|
| Doug Godshall | 94,954 | 31,809,590 |
| Renee Gaeta | — | — |
| Isaac Zacharias | 22,164 | 7,424,940 |
| Dan Puckett | 229 | 76,715 |
| Kevin Ballinger | — | — |
| Laura Francis | 4,048 | 1,356,080 |
| C. Raymond Larkin, Jr. | 4,545 | 1,522,575 |
| Frederic Moll, M.D. | 285,791 | 95,739,985 |
| Antoine Papiernik | 34,177 | 11,449,295 |
| Maria Sainz | 3,598 | 1,205,330 |
| Sara Toyloy | 1,943 | 650,905 |
| F.T. "Jay" Watkins | 3,796 | 1,271,660 |

36. Additionally, Company insiders currently own large amounts of Vested Company Options, RSU Awards, and other equity awards, some of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company as follows:

| Name | Vested Company Options (#) | Cash Consideration for Vested Company Options ($) |
|---|---|---|
| Doug Godshall | 376,766 | $123,816,138 |
| Renee Gaeta | — | — |
| Isaac Zacharias | 27,709 | 9,096,588 |
| Dan Puckett | 135 | 43,644 |
| Kevin Ballinger | — | — |
| Laura Francis | 13,690 | 4,495,960 |
| C. Raymond Larkin, Jr. | 28,688 | 9,421,483 |
| Frederic Moll, M.D. | 33,774 | 10,982,814 |
| Antoine Papiernik | — | — |
| Maria Sainz | — | — |
| Sara Toyloy | — | — |
| F.T. "Jay" Watkins | 101,694 | 33,484,000 |

| Name | Company RSU | Cash Consideration | Company PSU | Cash Consideration |
|---|---|---|---|---|

| | Awards (#) | for Company RSU Awards ($) | Awards (Maximum Performance)(#) | for Company PSU Awards (Maximum Performance)($) |
|---|---|---|---|---|
| Doug Godshall | 57,819 | 19,369,365 | 100,810 | 33,771,350 |
| Renee Gaeta | 19,890 | 6,663,150 | — | — |
| Isaac Zacharias | 34,654 | 11,609,090 | 29,588 | 9,911,980 |
| Dan Puckett | 13,276 | 4,447,460 | 14,204 | 4,758,340 |
| Kevin Ballinger | 1,733 | 580,555 | — | — |
| Laura Francis | 736 | 246,560 | — | — |
| C. Raymond Larkin, Jr. | 736 | 246,560 | — | — |
| Frederic Moll, M.D. | 1,730 | 579,550 | — | — |
| Antoine Papiernik | 736 | 246,560 | — | — |
| Maria Sainz | 1,730 | 579,550 | — | — |
| Sara Toyloy | 1,730 | 579,550 | — | — |
| F.T. “Jay” Watkins | 736 | 246,560 | — | — |

37. Moreover, certain employment agreements with certain Shockwave executives entitle such executives to severance packages, should their employment be terminated under certain circumstances. These ‘golden parachute’ packages are significant, and will grant several directors or officers entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

| Named Executive Officer | Cash($)(1) | Equity Awards($)(2) | Perquisites/ Benefits($)(3) | Total($)(4) |
|---|---|---|---|---|
| Doug Godshall | 1,933,750 | 53,140,715 | 50,880 | 55,125,345 |
| Renee Gaeta | 804,167 | 6,663,150 | 50,880 | 7,518,197 |
| Isaac Zacharias | 2,100,000 | 21,521,070 | 50,880 | 23,671,950 |
| Dan Puckett | — | 9,205,800 | — | 9,256,680 |

| Named Executive Officer | Base Salary Component of Severance($) | Bonus Component of Severance($) | Additional Payment Under Retention Agreement ($) | Total($) |
|---|---|---|---|---|
| Doug Godshall | 1,700,000 | 233,750 | — | 1,933,750 |
| Renee Gaeta | 750,000 | 54,167 | — | 804,167 |
| Isaac Zacharias | 848,076 | — | 1,251,924 | 2,100,000 |

38. The Proxy Statement fails to adequately disclose the full scope of communications regarding post-transaction employment of Zacharias and Stephens, including specifically, the terms of the proposed retention agreement for Stephens. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations

that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

39. Thus, while the Proposed Transaction is not in the best interests of Shockwave, Plaintiff, or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Proxy Statement***

40. The Shockwave Board caused to be filed with the SEC a materially misleading and incomplete Proxy Statement that, in violation the Exchange Act, fails to provide Plaintiff in her capacity as a Company stockholder, with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

41. The Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Proxy Statement fails to disclose:

a. Whether the confidentiality agreements entered into by the Company with J&J differed from any other unnamed confidentiality agreement entered into between the Company and an interested third parties; and

b. The full scope of communications regarding post-transaction employment of Zacharias, a President and CCO of the Company, and Stephens, the Company's Vice President of Research & Development, including specifically, the terms of the proposed retention agreement for Stephens.

*Omissions and/or Material Misrepresentations Concerning Shockwave Financial Projections*

42. The Proxy Statement fails to provide material information concerning financial projections for Shockwave provided by Shockwave management to the Company Board and

Perella Weinberg and relied upon by Perella Weinberg in its analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

43. Notably, the Proxy Statement reveals that as part of its analyses, Perella Weinberg reviewed: "certain internal financial statements, analyses and forecasts and other internal financial information and operating data relating to the business of Shockwave, in each case, prepared by or at the direction of the management of Shockwave and approved for [Perella Weinberg]'s use by management of Shockwave."

44. The Proxy Statement should have, but fails to provide, certain information in the projections that Shockwave management provided to the Company Board and Perella Weinberg. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

45. The Proxy Statement articulates that the Management prepared Company Projections were updated once on April 21, 2023 ("April 2023 Projections"), and then again on March 16, 2024 ("March 2024 Projections"); however, the Proxy Statement fails to disclose the April 2023 Projections.

46. The Proxy Statement fails to disclose why Company Management updated the Projections between April 2023 and March 2024, and in what specific manner the Projections were updated.

47. Further, the Proxy Statement fails to disclose if the Company provided either the April 2023 Projections, March 2024 Projections, or both to J&J or any other potentially interested third party during the process as part of the due diligence review.

48. With regards to the *Company Forecasts*, the Proxy Statement fails to disclose the inputs, metrics, and assumptions used to determine Revenue, Adjusted EBITDA, Adjusted EBITA and Unlevered Free Cash.

49. The Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

50. This information is necessary to provide Plaintiff, in her capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

51. Without accurate projection data presented in the Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the Perella Weinberg's financial analyses, or make an informed decision whether to vote her shares in favor of the Proposed Transaction. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

*<u>Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Perella Weinberg</u>*

52. In the Proxy Statement, Perella Weinberg describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

53. With respect to the *Selected Publicly Traded Company Comparison Analysis*, the Proxy Statement fails to disclose:

a. The inputs, metrics, and assumptions used to determine the Enterprise Value/ Revenue 2024E for each of the selected companies;

b. The specific inputs, metrics, and assumptions used to determine the Enterprise Value/ Revenue 2025E for each of the selected companies;

c. The specific inputs, metrics, and assumptions used to determine the EV/ 2024E multiples range of 6.5x to 12.5x utilized; and

d. The specific inputs, metrics, and assumptions used to determine the EV/ 2025E multiples range of 5.5x to 10.5x utilized.

54. With respect to the *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose:

a. The date upon which each of the selected precedent transactions closed;

b. The inputs, metrics, and assumptions used to determine the LTM EV/ Revenue Multiple for each of the selected precedent transactions;

c. The specific inputs, metrics, and assumptions used to determine the NTM EV/ Revenue multiple for each of the selected precedent transactions;

d. The specific inputs, metrics, and assumptions used to determine the LTM EV/ Revenue multiples range of 8.5x to 15.5x utilized; and

e. The specific inputs, metrics, and assumptions used to determine the NTM EV/ Revenue multiples range of 7.5x to 13.5x utilized.

55. With respect to the *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:

a. The inputs, metrics, and assumptions used to determine the discount rates of 11.25% to 12.75% utilized;

b. The inputs, metrics, and assumptions used to determine the perpetuity growth rates ranging from 3.0% to 5.0% utilized;

c. The present value of the estimate standalone unlevered free cash flows of the Company as of April 3, 2024, through 2033, and the inputs, metrics, and assumptions used to determine same; and

d. The weighted average cost of capital for the Company utilized.

56. With respect to the *Equity Research Analysts' Price Targets Analysis*, the Proxy Statement fails to disclose:

a. The specific price targets analyzed; and

b. The specific Wall Street firms that generated the analyzed price targets.

57. These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

58. Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes her value and serves her interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in her best interests as a public Shockwave stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

**FIRST COUNT**

**Violations of Section 14(a) of the Exchange Act**

**(Against All Defendants)**

59. Plaintiff repeats all previous allegations as if set forth in full herein.

60. Defendants have disseminated the Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

61. Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of her name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

62. As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

63. The Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

64. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

65. The Individual Defendants were at least negligent in filing a Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Proxy Statement not misleading.

66. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to decide whether to vote her shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

**SECOND COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against all Individual Defendants)**

67. Plaintiff repeats all previous allegations as if set forth in full herein.

68. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy Statement was materially misleading to Plaintiff in her capacity as a Company stockholder.

69. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

70. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Shockwave's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Proxy Statement was misleading. As a result,

the Individual Defendants are responsible for the accuracy of the Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

71. The Individual Defendants acted as controlling persons of Shockwave within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Shockwave to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Shockwave and all of its employees. As alleged above, Shockwave is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in her favor and against the Defendants, as follows:

A. Enjoining the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: May 7, 2024

**BRODSKY SMITH**

By: *Evan J. Smith*

Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Blvd., Ste. 900
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*